# The Pocket Veto: Historical Practice and Judicial Precedent

[The following two memoranda examine historical practice and judicial precedent under the Pocket Veto Clause of the Constitution, Art. I, § 7, cl. 2, in order to advise the President concerning the efficacy of a pocket veto during both intrasession and intersession adjournments of Congress.]

## I.

February 10, 1982

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum discusses generally the President's power to pocket veto legislation, with specific reference to the President's pocket veto of H.R. 4353 during the recent intersession adjournment of the 97th Congress.

Article I, § 7, clause 2 of the Constitution provides:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered; and if approved by two thirds of that House, it shall become a Law. . . . If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return, in which case it shall not be a Law.*

(Emphasis supplied.) The italicized phrase is commonly referred to as the "pocket veto" provision because it empowers the President to prevent a bill's becoming law simply by placing it in his pocket—*i.e.*, neither signing it nor returning it with his objections to its House of origin. The functional difference

134

between ordinary vetoes and pocket vetoes is that the latter cannot be overridden by Congress.

As the President's recent pocket veto of H.R. 4353 demonstrates, the questions raised by the pocket veto provision have considerable practical significance. If, contrary to the advice given orally by this Office, the pocket veto of H.R. 4353 was ineffective, that provision became law at the expiration of the ten-day period (Sundays excepted) after it was presented to the President. Because of the short time period involved, and because of the possible adverse consequence of an erroneous decision to pocket veto a bill rather than return it to Congress with objections, questions regarding the pocket veto provision often attain considerable urgency and importance. We therefore believe that it is useful to examine in advance the various issues arising under the pocket veto provision in a relatively comprehensive fashion in order to advise you regarding the legality of pocket vetoes in situations that are likely to arise in the future.

The pocket veto provision appears to have been adopted without controversy by the Framers; the proceedings and debates of the Constitutional Convention shed no light on its meaning. Interpretation of the provision must therefore rely on historical practice and on three pertinent judicial decisions: *The Pocket Veto Case*, 279 U.S. 655 (1929); *Wright v. United States*, 302 U.S. 583 (1938); and *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974).

## I. Historical Practice

Presidents throughout our history have used the pocket veto power frequently—a fact which is not surprising in light of the tendency on the part of Congress to present a mass of legislation to the President just before it adjourns and in view of the convenience to the President of exercising a veto that cannot be overridden by Congress. Most pocket vetoes have occurred after final adjournments of Congress or intersession adjournments between the first and second sessions.[1] Presidents have also pocket vetoed bills during intrasession adjournments[2] of varying lengths,[3] but this practice has been relatively unusual.[4] The historical practice therefore strongly supports the pocket veto during final and intersession adjournments, but is inconclusive for intrasession adjournments.[5]

---

[1] *See* House Doc. No. 493, 70th Cong., 2d Sess. (1928) (memorandum prepared by the Attorney General and presented to Congress; relied on by Supreme Court in *The Pocket Veto Case*, 279 U.S. 655 (1929)).

[2] The Attorney General rendered an opinion in 1943 concluding that the pocket veto provision was triggered by an adjournment within the first session of the 78th Congress which lasted from July 8 to September 14, 1943. 40 Op. Att'y Gen. 274 (1943).

[3] *See* Office of Legal Counsel, Pocket Vetoes During Short Holiday Recesses (Jan. 13, 1971), Pocket Vetoes During Adjournments of Congress Within a Session (Nov 19, 1968).

[4] *See Kennedy v Sampson*, 511 F.2d at 442–45 (appendix analyzing pocket vetoes during all intrasession adjournments of more than three days since 1800)

[5] While highly relevant, the practice engaged in by the Executive Branch and generally acquiesced in by Congress is not dispositive *See The Pocket Veto Case*, 279 U.S. at 690 (executive practice, acquiesced in by the legislature, is entitled to "great regard" but is "not absolutely binding on the judicial department. . .") (quoting *State v South Norwalk*, 77 Conn 257, 264). It is ultimately the province and duty of the Judicial Branch to "say what the law is." *United States v Nixon*, 418 U.S. 683, 703 (1974), quoting *Marbury v. Madison*, 5 U S (1 Cranch) 137, 177 (1803). Executive practices, even ones of long duration, must yield to contrary judicial interpretations.

## II. Judicial Decisions

### A. *The Pocket Veto Case*

*The Pocket Veto Case* involved a Senate bill which authorized certain Indian tribes to bring suit against the United States in the Court of Claims. The bill passed both Houses and was duly presented to the President on June 24, 1926. On July 3, 1926, the House of Representatives adjourned *sine die* and the Senate adjourned to November 12, the date to which, sitting as a court of impeachment, it had previously adjourned for the trial of certain articles of impeachment.[6] The July 3 adjournment was the final adjournment of the first session of the 69th Congress. The ten-day period (Sundays excepted) provided for presidential action under Article I, § 7, clause 2 expired on July 6, 1926, three days after the first session of Congress adjourned. The President neither signed the bill nor returned it to the Senate and the bill was not published as a law.

Contending that the bill had become a law without the President's signature, the Indian tribes filed suit in the Court of Claims. The Court of Claims sustained the United States' demurrer and the Supreme Court affirmed unanimously. Justice Sanford's opinion concluded that the word "adjournment" was not limited to final adjournments of a Congress, but also included interim adjournments between or within sessions. The determinative question, therefore, was not whether Congress had "adjourned," but rather whether the adjournment was one which "prevent[ed]" the President from returning a bill to the House in which it originated in the time allowed.

The specific question, in the Court's view, was whether the intersession adjournment of Congress prevented the President from returning the bill, or whether the Constitution was satisfied by the possibility of delivery to an officer or agent of the House of origin, to be held by him and delivered to the House when it resumed its sittings for the next session. The Court concluded that "the 'House' to which the bill is to be returned, is the House in session." 279 U.S. at 682. It followed that

> under the constitutional mandate [the bill] is to be returned to the
> "House" when sitting in an organized capacity for the transaction
> of business, and having authority to receive the return, enter the
> President's objections on its journal, and proceed to reconsider
> the bill; and that no return can be made to the House when it is not
> in session as a collective body and its members are dispersed.

*Id.* at 683.

In rejecting the contention that delivery to an agent sufficed when the House was not in session, the Court observed that Congress had never authorized agents to receive bills returned by the President during its adjournment. Moreover,

---

[6] The impeachment proceedings were brought against George W. English, a federal district judge. English resigned before the date for the Senate trial. *See* 68 Cong. Rec 3–4 (1926).

delivery to such an agent, even if authorized by Congress, "would not comply with the constitutional mandate." *Id.* at 684:

> The House, not having been in session when the bill was delivered to the officer or agent, could neither have received the bill and objections at that time, nor have entered the objections upon its journal, nor have proceeded to reconsider the bill, as the Constitution requires; and there is nothing in the Constitution which authorizes either House to make a *nunc pro tunc* record of the return of a bill as of a date on which it had not, in fact, been returned. Manifestly it was not intended that, instead of returning the bill to the House itself, as required by the constitutional provision, the President should be authorized to deliver it, during an adjournment of the House, to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months—not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid. In short, it was plainly the object of the constitutional provision that there should be a timely return of the bill, which should not only be a matter of official record definitely shown by the journal of the House itself, giving public, certain and prompt knowledge as to the status of the bill, but should enable Congress to proceed immediately with its reconsideration; and that the return of the bill should be an actual and public return to the House itself, and not a fictitious return by a delivery of the bill to some individual which could be given a retroactive effect at a later date when the time for the return of the bill to the House had expired.

*Id.*

### B. *Wright v. United States*

*Wright* v. *United States,* 302 U.S. 583 (1938), involved a Senate bill which granted jurisdiction to the Court of Claims to adjudicate the petitioner's claim against the United States. The bill passed both Houses during the first session of the 74th Congress and was presented to the President on April 24, 1936. On May 4, 1936, the Senate recessed until noon on May 7; the House of Representatives remained in session. Because the Senate was in recess for not more than three days, it was not necessary to obtain the consent of the House of Representa-

137

tives pursuant to Article I, § 5, clause 4 of the Constitution.[7] On May 5, the tenth day (Sundays excepted) after receiving the bill, the President returned it to the Senate with a message stating his objections. The bill and the message were delivered to the Secretary of the Senate. The Senate received the President's message when it reconvened on May 7 and referred the bill and the President's message to committee. No further action was taken.

The petitioner presented his petition to the Court of Claims, contending that the President's veto of the bill was ineffective because, under *The Pocket Veto Case*, delivery to an agent of the Senate did not constitute a constitutionally sufficient return.[8] The Court of Claims denied the petition and the Supreme Court affirmed. The Court's opinion, *per* Chief Justice Hughes, held only that the President's veto of the legislation was effective; it did not directly concern the pocket veto. In holding that the President was not prevented from vetoing the bill by the temporary recess of the Senate, however, the opinion necessarily implied that a pocket veto of the bill would have been ineffective. Moreover, the Court's analysis contained broad language which stands in sharp contrast to *The Pocket Veto Case*.

The Court held, first, that "Congress" had not adjourned when only one of its Houses was in recess. Because "Congress" was comprised of both Houses, the recess of the Senate while the House remained in session did not amount to an adjournment of Congress.

Second, the Court rejected the argument that the President was prevented from returning the bill because of the Senate's recess. It noted that the Constitution did not forbid return of a bill to an agent of the Congress such as the Secretary of the Senate. Nor was there any practical difficulty in returning the bill during a recess:

> The organization of the Senate continued and was intact. The Secretary of the Senate was functioning and was able to receive, and did receive, the bill. . . . There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during a session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. . . . To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.

*Id.* at 589–90.

The Court distinguished *The Pocket Veto Case* on the ground that the dangers which the Court had envisaged with respect to an intersession adjournment by

---

[7] Article I, § 5, clause 4 provides: "Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting."

[8] The petitioner contended that the bill had not been pocket vetoed because the pocket veto provision applies only when both Houses have adjourned. Brief for Petitioner in *Wright v United States* at 18

both Houses were illusory in the context of an intrasession adjournment by one House for a period of three days or less. In the case of such a brief recess, there was no danger that the public would not be promptly and fully informed of the return of the bill with the President's objections, or that the bill would not be properly safeguarded or duly recorded upon the journal of the House, or that it would not be subject to reasonably prompt action by the House. *Id.* at 595.

The Court specifically declined to address the question whether an intrasession adjournment of more than three days, for which the consent of both Houses is required pursuant to Article I, § 5, clause 4, would prevent the return of a bill and thereby trigger the pocket veto provision. *Id.* at 598. It held only that

> where the Congress had not adjourned and the House in which the bill originated is in recess for not more than three days under the constitutional permission while Congress is in session, the bill does not become a law if the President has delivered the bill with his objections to the appropriate officer of that House within the prescribed ten days and the Congress does not pass the bill over his objections by the requisite votes.

*Id.*[9]

## C. *Kennedy v. Sampson*

*Kennedy* v. *Sampson*, 511 F.2d 430 (D.C. Cir. 1974), involved a Senate bill which was presented to the President on December 14, 1970. On December 22 both Houses adjourned pursuant to a concurrent resolution, the Senate until December 28 and the House until December 29. The Senate authorized its Secretary to receive presidential messages during the adjournment. On December 24 the President issued a memorandum announcing that he would withhold his signature from the bill; the President did not, however, return the bill to the Senate. The ten-day period (Sundays excepted) for presidential approval expired on December 25. The bill was not published as a law.

The plaintiff, a United States Senator who had voted for the measure, brought suit in district court against the Administrator of the General Services Administration and the Chief of White House Records seeking a declaration that the bill had become law and an order requiring the defendants to publish the bill as law. The defendants contended that the bill had been validly pocket vetoed and had not become law. The district court granted summary judgment for the plaintiff and the United States Court of Appeals for the District of Columbia Circuit affirmed.[10]

The court, *per* Judge Tamm,[11] began by observing that the pocket veto power is an exception to the general rule that Congress may override the President's veto.

---

[9] Justice Stone wrote an opinion, joined by Justice Brandeis, which agreed that the bill did not become a law but concluded, contrary to the majority opinion, that the bill had been validly pocket vetoed. Justice Cardozo took no part in the decision of the case

[10] The Solicitor General determined not to petition the Supreme Court for a writ of certiorari

[11] Judges Fahy and Bazelon concurred in the opinion

139

As such, in the court's opinion, the power must be limited by the specific purpose which it was intended to serve. Applying this narrow construction, the court held that the congressional adjournment at issue fell within the rule of *Wright* v. *United States* rather than that of *The Pocket Veto Case*. The court found it immaterial that the adjournment was for five days rather than three days, as in *Wright*. Nor was it significant that both Houses had adjourned, rather than only the House of origin as in *Wright*, since the presence or absence of the non-originating House could have no relevance to the validity of the pocket veto.

Moreover, Judge Tamm concluded that a pocket veto would have been inappropriate even under the standards set forth in *The Pocket Veto Case:* "[t]he modern practice of Congress with respect to intrasession adjournments creates neither of the hazards—long delay and public uncertainty—perceived in *The Pocket Veto Case*." 511 F.2d at 440. Intrasession adjournments virtually never involved interruptions of the magnitude considered in *The Pocket Veto Case;* and "[m]odern methods of communication," *id.* at 441, make the return of a disapproved bill to the appropriate officer of an originating House a matter of public record. The court therefore concluded broadly that

> an intrasession adjournment of Congress does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential messages during the adjournment.

*Id.* at 437. *See also id.* at 442.[12]

### III. Interests Served by the Pocket Veto

These cases identify three distinct interests—sometimes conflicting, sometimes reinforcing—served by the pocket veto provision of the Constitution: (1) the interest in ensuring that both Congress and the President have their due say in the process of lawmaking (the interest in mutuality); (2) the interest in avoiding delay in the process by which Congress determines whether to override a presidential veto (the interest in prompt reconsideration); and (3) the interest in ensuring public awareness of, and certainty about, the status of legislation (the interest in public certainty).

*A. Mutuality*

Article I, § 7 of the Constitution provides generally that both the President and the Congress play a role in the lawmaking process—the President by approving

---

[12] Following the *Kennedy* decision, the Department of Justice issued a press release stating

> President Ford has determined that he will use the return veto rather than the pocket veto during intrasession and intersession recesses and adjournments of the Congress, provided that the House of Congress to which the bill and the President's objections must be returned according to the Constitution has specifically authorized an officer or other agent to receive return vetoes during such periods.

Department of Justice Press Release, Apr. 13, 1976, at 2 [NOTE: The immediate occasion for this press release was the consent judgment in *Kennedy* v *Jones*, 412 F.Supp. 353 (D.D C. 1976) Ed.]

or vetoing legislation, the Congress by passing legislation initially and by overriding presidential vetoes. The Framers evidently intended that both branches would play their assigned role whenever possible. As the Court said in *Wright* v. *United States*, 302 U.S. at 596:

> The constitutional provisions [for presidential veto, con-gressional override, and pocket veto] have two fundamental pur-poses: (1) that the President shall have suitable opportunity to consider the bills presented to him, and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes.

The Framers recognized that certain technical rules were necessary in order to prevent frustration of the interest in mutuality. *See* 1 J. Story, Commentaries on the Constitution of the United States § 891 (5th ed. 1905). First, there was the possibility that the President would fail to act on a bill presented to him by Congress. Because the bill would not be signed, it would not become a law; but because the President would not return it with his objections to its House of origin, there would be no opportunity for Congress to override a veto. To avoid a *de facto* veto which would deprive Congress of its power to override, the Framers provided that the President must act within ten days (Sundays excepted) or the bill would become law as if he had signed it.

This solution, however, created a second problem. If Congress was in adjourn-ment on the tenth day (Sundays excepted) after a bill was presented to the President, so as to prevent the President from returning the bill with his objec-tions, the bill would automatically become law on the expiration of the tenth day and the President would be deprived of his veto power. Congress could hold up the presentation of legislation to the President until the day it went out of session, thereby essentially writing the President out of the lawmaking process. The pocket veto power dealt with this problem by providing that a bill would not become law if the President failed to sign it and was prevented from returning it because of a congressional adjournment.[13]

The pocket veto serves the interest in mutuality because it achieves the best possible approximation of the shared lawmaking generally contemplated in Article I, § 7 in those situations in which the presidential veto and congressional override powers cannot coexist. When the choice is between depriving the President of his veto or retaining the presidential veto but denying Congress the power to override, the interest in mutuality is best served by the latter alternative. Congress has power to avoid any possibility of a pocket veto by arranging to be in session on the tenth day (Sundays excepted) after a bill is presented to the President, or by delaying presentation of a bill until a time when it is scheduled to be in session on the tenth day (Sundays excepted) following. Moreover, even if a

---

[13] If the President signed the bill, it would become law notwithstanding the adjournment of Congress *Edwards* v *United States*, 286 U.S 482 (1932), *La Abra Silver Mining Co* v. *United States*, 175 U S 423 (1899)

141

bill is pocket vetoed, the Congress can simply reenact it when it returns to session. *See The Pocket Veto Case,* 279 U.S. at 679 n.6. The President, on the other hand, in the absence of a pocket veto would have no means of preventing Congress from presenting bills to him on the last day before an adjournment, thus preventing him from exercising his veto. And when the bill became law, the President would have no way to repeal it without affirmative action by a majority of both Houses of Congress. The interest in ensuring that both the President and Congress play their assigned roles in lawmaking is thus better served by the presence of the pocket veto than by its absence.

Because the pocket veto does not provide for congressional override, it serves the interest in mutuality only when, at the expiration of the ten-day period (Sundays excepted) following presidential receipt of a bill: (1) Congress has adjourned *sine die* at the end of its final session and has thereby terminated its legislative existence; or (2) Congress has taken some other adjournment and has failed to provide any effective means by which the President may return a bill during the adjournment. Only in these situations is the President unable to exercise his veto power by returning the bill with objections. In all other situations, the interest in mutuality is served by an ordinary veto subject to congressional override and is disserved by a pocket veto.

## B. Prompt Reconsideration

The pocket veto also serves the interest in ensuring the possibility of prompt congressional reconsideration of a bill following a presidential veto. In *The Pocket Veto Case,* for example, the Court was concerned that delivery to a congressional agent during an intrasession adjournment would permit the agent to hold the disapproved bill for "days, weeks or perhaps months, . . . keeping the bill in the meantime in a state of suspended animation . . . and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid." 279 U.S. at 684. In *Wright v. United States,* 302 U.S. 583, the Court emphasized that a three-day recess of one House did not pose the dangers of "undue delay," identified in *The Pocket Veto Case,* because a mere "brief," "short," and "temporary" recess, extending for a "very limited time only," did not create the danger that a vetoed bill "would not be subject to reasonably prompt action by the House." *Id.* at 595. And *Kennedy v. Sampson* recognized that "long delay" was one of the hazards perceived in *The Pocket Veto Case.* 511 F.2d at 440.

The interest in prompt reconsideration does not lend itself to precise quantification. The adjournment at issue in *The Pocket Veto Case* lasted roughly five months; the adjournments at issue in *Wright v. United States* and *Kennedy v. Sampson* were of three and five days, respectively. Between these figures lies a broad area of uncertainty, in which the argument favoring the validity of a pocket veto becomes stronger as the period of adjournment increases.

The interest in prompt reconsideration will sometimes reinforce the interest in mutuality. A final adjournment of Congress, in which the interest in mutuality is

strongly implicated, will typically continue for a substantial period of time. Similarly, non-final adjournments in which Congress has appointed agents to receive presidential messages, in which the interest in mutuality is not served by a pocket veto, are also typically of brief duration. On the other hand, non-final adjournments can extend for a considerable period of time and final adjournments can be very brief. In some cases, therefore, the interest in mutuality and the interest in prompt reconsideration will conflict.

## C. Public Certainty

The third interest underlying the pocket veto provision is that of ensuring that the public is reliably informed about the process of lawmaking. In *The Pocket Veto Case,* the Court said that return of a disapproved bill to a congressional agent during an intersession adjournment would not provide "certain knowledge on the part of the public as to whether it had or had not been seasonably delivered" because return of the bill would not be "a matter of official record definitely shown by the journal of the House itself, giving public, certain and prompt knowledge as to the status of the bill. . . ." 279 U.S. at 684–85. In *Wright* v. *United States,* the Court recognized that the pocket veto provision safeguarded against "[t]he prospect that . . . the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill would not be properly safeguarded or duly recorded upon the journal of the House," although in the context of a three-day recess of one House only, the Court found this danger was "wholly chimerical." 302 U.S. at 595. And *Kennedy* v. *Sampson* recognized that the pocket veto provision was designed, in part, to ensure public certainty. *See* 511 F.2d at 440.

The interest in public certainty seems to have factual and legal components. Factually, there is a strong interest in guaranteeing that the public has full knowledge of the President's decision to veto a bill, and of the reasons for that decision as stated in the President's objections. Legally, there is a strong interest in providing the public with certain knowledge whether the bill has become law. Obviously, segments of the public affected by a bill will often have a compelling interest in knowing whether the bill has become a law so that they may structure their actions in order to comply with the law or to obtain the benefits provided thereunder.

As a practical matter, as the Court observed in *Kennedy* v. *Sampson,* the interest in obtaining the facts of a veto will usually be well served by the availability of "[m]odern methods of communication," 511 F.2d at 441. Presidential vetoes are widely reported in the press. The problem of legal uncertainty, on the other hand, remains pressing today. The need for legal certainty requires hard-and-fast rules that can easily and clearly be applied in individual cases. In this respect, the interest in public certainty stands in tension with the interest in prompt reconsideration since the latter interest increases incrementally in

143

strength with the length of an adjournment and is not susceptible to resolution through a clear, non-arbitrary rule.[14]

The interest in public certainty reinforces the interest in mutuality in the case of final adjournments. In the case of non-final adjournments, the interest in public certainty might occasionally conflict with the interest in mutuality when there are legal questions regarding whether Congress has designated an agent to receive presidential messages during its adjournment.

## IV.

The above analysis provides some guidance as to the validity of pocket vetoes in a variety of recurring situations.

### A. Final Adjournments

A pocket veto is certainly appropriate after the final adjournment of a Congress. If it were not, there would be a serious question as to whether the pocket veto provision of the Constitution had any meaning at all. That pocket vetoes are appropriate after a final adjournment was settled in *The Pocket Veto Case*[15] and has not been questioned by the subsequent decisions which narrowed *The Pocket Veto Case* in other respects. Moreover, in the context of a final adjournment of Congress all three interests served by the pocket veto provision suggest the appropriateness of a pocket veto. Without a pocket veto, the President could be denied his proper role in lawmaking by the presentation of numerous bills towards the end of the final session of Congress (interest in mutuality); final adjournments are often lengthy (interest in prompt reconsideration); and a rule providing for pocket vetoes in this situation is capable of hard-and-fast application (interest in public certainty).

Accordingly, the President may pocket veto bills after the final adjournment of a Congress without fear that his veto will be ineffective and the bills will become law.

### B. Intersession Adjournments

We also believe the President may pocket veto bills during intersession adjournments. Adjournments between sessions are typically accomplished by means of concurrent resolutions[16] adjourning the session *sine die*.[17] The Presi-

---

[14] Judge Tamm's distinction between intrasession and intersession adjournments in *Kennedy* v. *Sampson* appears based, largely, on the need for hard-and-fast rules in this area. A sharp distinction between intersession and intrasession adjournments would be inappropriate if the only criterion were the length of an adjournment, since while intersession adjournments are also generally relatively lengthy and intrasession adjournments relatively brief, this is not always the case

[15] "It is also conceded, as we understand, that the President is necessarily prevented from returning a bill by a final adjournment of the Congress, since such adjournment terminates the legislative existence of the Congress and makes it impossible to return the bill to either House." 279 U.S at 681.

[16] A concurrent resolution is required by Article I, § 5, clause 4, prohibiting either House from adjourning for more than three days without the consent of the other. *See* note 7 *supra*

[17] A *sine die* adjournment is necessary because any adjournment to a date certain within the session would not terminate the session. In *The Pocket Veto Case* Congress adjourned its first session even though the Senate adjourned to a date certain within the session rather than *sine die*. This was because of an unusual situation in which the Senate agreed to return to perform non-legislative business, the consideration of certain articles of impeachment After meeting to consider these articles, the Senate, sitting as a court of impeachment, voted to adjourn *sine die See* note 6 and accompanying text, *supra*.

dent's pocket veto of H.R. 4353 on December 29, 1981, occurred during a *sine die* adjournment of the first session of the 97th Congress, beginning December 16, 1981.[18] By joint resolution, Congress agreed to reconvene for the second session on January 25, 1982.[19] In this section we confirm the advice given orally by this Office that the President was authorized to pocket veto H.R. 4353.

*The Pocket Veto Case* stands at least for the proposition that a pocket veto is appropriate during an intersession adjournment. The Court in *Wright*, distinguishing *The Pocket Veto Case*, strongly implied that the case retained force in the context of intersession adjournments:

> However real th[e] dangers [envisaged by the Court in *The Pocket Veto Case*] may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session, the situation with which the Court was dealing, they appear to be illusory when there is a mere temporary recess.

302 U.S. at 595. Similarly, the court in *Kennedy* v. *Sampson* limited its holding to intrasession adjournments and sharply distinguished these from intersession adjournments.

Although we believe, and have frequently advised, that the pocket veto is appropriate in the context of intersession adjournments, we recognize that objections could be made to this conclusion based on an analysis of the interests underlying the pocket veto provision. The interest in mutuality is not particularly strong in the case of a pocket veto during an intersession adjournment, at least so long as the House of origin has appointed an agent to receive presidential messages. The President could veto the bill and return it, together with his objections, to the agent who would lay the matter before the House for reconsideration upon its return. Thus the President would not be deprived of his power to veto legislation. A pocket veto, on the other hand, arguably disserves the interest in mutuality in this circumstance because it would deprive Congress of its power to override. The interest in prompt reconsideration is served by a pocket veto during lengthy intersession adjournments but not by pocket vetoes during brief intersession adjournments. Thus, pocket vetoes during brief intersession adjournments are somewhat more vulnerable than those during lengthy intersession adjournments. However, we believe that the interest in public certainty justifies a hard-and-fast rule that pocket vetoes are always appropriate during intersession adjournments. *See* note 14 *supra*. The alternative of a rule based upon the length of an adjournment lacks any constitutional basis. The alternative of a rule that intersession pocket vetoes are not appropriate could seriously frustrate the interest in prompt reconsideration in the case of lengthy adjournments.

---

[18] *See* S. Con. Res 57, 97th Cong : 1st Sess , 127 Cong. Rec. S15631 (daily ed Dec 16, 1981)
[19] *See* H.J. Res 377, 97th Cong , 1st Sess , 127 Cong. Rec. H9638 (daily ed Dec 16, 1981).

It is our opinion, therefore, that the President may validly pocket veto bills during all intersession adjournments.[20] Accordingly, the President's pocket veto of H.R. 4353 was effective and prevented the bill from becoming law.

## C. Intrasession Adjournments

Any decision to pocket veto legislation during an intrasession adjournment would in all probability be met with an immediate court challenge in which the prospects that the Executive's position will be sustained are uncertain at best. *Wright* v. *United States* rejected the contention that the President could pocket veto legislation during a three-day intrasession adjournment of the House of origin. Although the *Wright* decision contained language that could be read as limited to adjournments of three days or less, for which the consent of the other House is not required under Article I, § 5, clause 4, the subsequent decision in *Kennedy* went further. *Kennedy* involved, on its facts, a recess of both Houses for which the consent of the other House was required. Moreover, the court in *Kennedy* clearly stated that pocket vetoes are never appropriate during intrasession adjournments.

The rule adopted by the Court in *Kennedy* may best be understood by examining the interests underlying the pocket veto provision. The interest in mutuality is disserved by the pocket veto during intrasession adjournments because the President is not disabled from returning a bill with his objections so long as the House of origin has empowered an agent to receive presidential messages. The interest in prompt reconsideration is served only during lengthy intrasession adjournments, which have always been uncommon and which have become increasingly rare in recent years. The interest in public certainty would be served by a hard-and-fast rule permitting pocket vetoes during all adjournments of the House of origin which require the consent of the other House under Article I, § 5, clause 4; but the *Kennedy* and *Wright* decisions indicate that the courts are more likely to endorse a flat rule against any pocket vetoes during intrasession adjournments. It could plausibly be argued, however, that the interest in public certainty is equally served by a rule permitting pocket vetoes during adjournments lasting more than a set period of time. For example, the interest in public certainty would be served by a rule permitting pocket vetoes during adjournments of ten days or more.

A pocket veto during an intrasession adjournment would be directly contrary to the language in *Kennedy* and inconsistent with at least the spirit of *Wright*. The interests underlying the pocket veto provision do not clearly resolve the question whether pocket vetoes are appropriate during intrasession adjournments. This is not to say that a pocket veto should never be considered during a session. There is room to argue that *Kennedy* was an erroneous decision and that the broad dicta in

---

[20] Pocket vetoes during intersession adjournments are, we believe, valid whether or not the House of origin has appointed an agent to receive presidential messages. It appears that the House of Representatives did not appoint such an agent during the intersession adjournment of the 97th Congress

*Wright* should not be followed today. It must be recognized, however, that such an argument would face an uphill battle in the courts.

We would recommend that the President not pocket veto legislation during intrasession adjournments unless he is willing to risk an almost certain court challenge in which he may not be successful. If the President does wish to exercise his pocket veto, he may wish to choose a bill which would not appreciably damage his program if it were enacted into law.[21] We would advise that the President not pocket veto bills unless the intrasession adjournment involved extends for a significant period of time—ten days at least—and that both Houses be in adjournment on the date set for return of the bill.

## D. One House Only Adjourns Sine Die

An intermediate case is that in which one House adjourns *sine die* and the other remains in session.[22] Read broadly, *Wright* v. *United States* would preclude a pocket veto since that case stated that the adjournment of one House only does not trigger the pocket veto provision. *See* 302 U.S. at 587–88. This clearly was not the basis for the Court's decision, however, since the Court expressly reserved the question whether a one-House adjournment lasting for more than three days would "prevent" the return of a vetoed bill. *Id*. at 598. *See Kennedy* v. *Sampson* at 440 n.29.

We are of the opinion that a pocket veto would be effective when the House of origin has adjourned *sine die* at the end of a final session. A similar conclusion is appropriate when the House of origin has remained in session and the other House has adjourned *sine die* at the end of its final session, since it would be impossible in this situation for Congress as a whole to override the President's veto. Somewhat more difficult is the situation in which the House of origin has adjourned *sine die* at the end of the first session and the other House has remained in session. This Office has advised that either a pocket veto or a return veto would be appropriate in this situation.[23] However, a pocket veto would probably be ineffective when the House of origin remains in session and the other House adjourns *sine die* at the end of the first session.

## V. Miscellaneous Problems

Finally, we address certain miscellaneous problems which have arisen in connection with the pocket veto.

## A. Procedure in Uncertainty

The President is placed in a somewhat difficult position when he wishes to veto a bill but is uncertain whether or not he has authority to exercise the pocket veto.

---

[21] H R. 4353, which the President pocket vetoed on December 29, 1981, is an example of a good test case. As the President noted in his veto statement, the measure "would benefit the creditors of a single large asset bankruptcy" and was in effect an "effort to confer special relief in the guise of general legislation." 17 Weekly Comp. Pres Doc. 1429 (1981)

[22] During the first session of the 96th Congress, for example, the Senate adjourned *sine die;* the House did not adjourn *sine die* but held *pro forma* sessions up to and including the date it reconvened for the second session.

[23] Memorandum for Honorable Lloyd N Cutler, Jan 2, 1980

147

If the President attempts a pocket veto, there is always the danger that his action will be ineffective and that the bill will be held to have become law without his signature. On the other hand, if he attempts to return the bill with his objections to the House of origin, there is the danger that his actions will undermine the argument, which he might wish to make in a future case, that he was "prevented" from returning the bill within the meaning of the pocket veto provision.[24]

This dilemma is not fully resolvable; difficulties will persist so long as the contours of the pocket veto power remain indistinct. We believe that the President would be justified in taking either of two courses of action. First, he could establish a policy of pocket vetoing all bills during final adjournments, intersession adjournments, and intrasession adjournments lasting for a set period of time or longer. This policy would have the virtue of consistency and would frame the constitutional issues sharply for a court challenge. On the other hand, it must be recognized that this policy would pose serious litigation risks if the policy was to pocket veto bills during intrasession adjournments of relatively brief duration.

Second, the President could adopt a case-by-case approach to the problem, taking account of the degree of litigation risk and of the importance to the President's program that the bill not be enacted. If the bill is unimportant to the President's program and the chances of success in court appear high, the better course may be to pocket veto.[25] If the bill is important or the chances of success appear low, the better course may be to return the bill with objections which explicitly state that the President believes he would be within his right to pocket veto the legislation.

## B. Recess Appointments

Article II, § 2, clause 3 of the Constitution provides: "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the end of their next Session." The President's power to make recess appointments has been the subject of some uncertainty and disagreement with Congress in recent years. The recess appointment and pocket veto powers are related because of the similarity between the concepts of a "recess" of the Senate in which the President can make temporary appointments without obtaining the advice and consent of the Senate and an "adjournment" of the House of origin which, if it prevents the return of a bill with objections, will permit the President to prevent the bill from becoming law without submitting his veto to a possible congressional override. Practice under

---

[24] A different problem may arise when the President wishes to ensure that a bill which has been presented to him less than ten days (Sundays excepted) before an adjournment becomes law. If the President fails to sign the bill, there is no guarantee that the bill will automatically become law upon the expiration of the time period since it may have been pocket vetoed. This problem does not pose a serious dilemma, however, for the President can simply sign the bill within the ten-day period, thus ensuring that the bill becomes law while preserving his arguments under the pocket veto provision. It has long been settled that the President may sign legislation after Congress has adjourned. *See* note 13, *supra*

[25] To avoid an implication that he has exercised a return rather than a pocket veto, the President should not deliver a message to the House of origin stating his objections if he intends to exercise the pocket veto power.

the pocket veto provision may therefore have some bearing on an interpretation of the scope of the recess appointment power.

There are sound reasons to believe that the President has authority to make recess appointments in situations in which a pocket veto might well be inappropriate. First, even if "recess" and "adjournment" have the same meaning in the Constitution, this fact would not equate the pocket veto and recess appointment powers. The decisions holding that the President could not pocket veto bills during brief intrasession adjournments were not premised on the notion that these were not "adjournments" in the constitutional sense; rather, they were bottomed on the theory that, although they were adjournments, they did not "prevent" the return of disapproved bills. Second, it is by no means clear that "adjournment" and "recess" do have the same meaning in the Constitution. In common parlance, the word "recess" connotes a brief break in continuity, whereas an "adjournment" may include relatively brief periods but will more typically refer to a longer or indefinite suspension of activity. It is therefore possible that a very brief suspension will amount to a "recess" but not an "adjournment."

Despite the above analysis, the decisions in *Wright* v. *United States* and *Kennedy* v. *Sampson* counsel caution in making recess appointments. This Office has generally advised that the President not make recess appointments, if possible, when the break in continuity of the Senate is very brief.

## C. Nominations

You have expressed concern that the President may prejudice his ability to pocket veto legislation if he sends nominations to the Senate during an intersession adjournment. We assume that a nomination would be delivered to the Secretary of the Senate, who is typically designated by that body to receive messages from the President during adjournments.[26] The sending of a nomination to the Senate would not, we believe, seriously prejudice the President's stand on the pocket veto. Simply sending over a nomination has no legal significance unless and until the Senate takes action evidencing its understanding that a nomination has been validly made. At most, it would evidence the President's understanding that the Secretary of the Senate is indeed authorized to receive presidential messages—a question which is not seriously in doubt in light of the *Wright* and *Kennedy* decisions and the explicit authorization to this effect typically approved by the Senate. However, we can perceive no strong reason to send nominations to the Senate during intersession adjournments.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[26] *See, e.g.,* 127 Cong Rec S15632 (daily ed. Dec. 16, 1981) The Secretary of the Senate may have inherent authority even in the absence of specific authorization to receive presidential messages *See Wright* v *United States,* 302 U.S at 599 (Stone, J, dissenting in part)